In the Matter of CENTRAL ICE CREAM COMPANY, Debtor.

Appeals of Joan G. RAFEL and George S. Kamberos, Bernard C. Chaitman, Trustee, et al.

Nos. 86–2116, 86–3111 and 87–1022.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 2, 1987.

Decided Dec. 31, 1987.

Rehearing and Rehearing En Banc Denied in No. 87–1022 Feb. 16, 1988.

Theodore M. Becker, Becker & Tenenbaum, Chicago, Ill., for appellant.

Jerold S. Solovy, Jenner & Block, Chicago, Ill., for appellee.

Before POSNER and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

People who win a big jackpot in the lottery discover that they have more life-long friends than they remembered. Central Ice Cream Co. won a $52 million verdict in state court in a fraud and contract suit against McDonald's Corp. and discovered that people owned 372% of its shares. Lawyers, too, have queued up. This case is about their requests for fees as sanctions for overzealousness in pursuing claims to the kitty.

## I

When it won the verdict Central was bankrupt, its suit the estate's principal asset. McDonald's filed post-trial motions but offered a settlement of $15.5 million if Central accepted before the trial court acted. Central's board of directors accepted. McDonald's also wanted a release of any personal claims of Thomas Cummings, Central's president and the record owner of a majority of its stock; the board and the trustee agreed to apportion $4 million of the $15.5 million to satisfy Cummings. The remaining $11.5 million would pay Central's trial counsel and cover the firm's debts; if it would not leave anything for equity investors other than Cummings, the creditors were unconcerned.

The board, joined by the trustee, recommended that the bankruptcy court approve the settlement. Some of Central's purported shareholders accepted this, but "holders" of more than 300% of its shares protested and attempted to intervene as parties. McDonald's then agreed to pay $15.5 million to Central without a release from Cummings. The bankruptcy judge accepted filings and received evidence offered by the shareholders but neither granted nor denied the motions to intervene. The shareholders' evidence included the testimony of experienced attorneys, who opined that the 70% discount from the $52 million verdict was too steep, given the merits of the case and what they saw as the likeli-

hood of its affirmance. In the end the judge approved the compromise of $15.5 million. 59 B.R. 476 (Bkr.N.D.Ill.1985). The bankruptcy judge wrote (*id.* at 487):

In approving a settlement in a liquidation proceeding, the Court must determine what course of action is in the best interests of the Estate, with major consideration to the interests of the creditors.... Given the fact that approval of the settlement will result here in sufficient proceeds to pay in full all allowed claims of creditors, no creditor has or can maintain a legitimate objection to the proposed settlement. The Court has considered the views of the objecting shareholders and persons who claim an equity interest in Central.... [U]nder all the circumstances the settlement is also fair to stockholders, in that it will provide a million dollars to distribute to stockholders. To seek greater return for the shareholders at risk to the creditors would be most unfair. A creditor supplies to a business in return for getting paid an agreed price. A stockholder puts up risk capital as an investment. The creditor's interest is given major consideration because it is fair that creditors who expected and deserved no risk should not now risk losing all in an effort to recover more for investors.

The bankruptcy judge withheld some $143,-000 of the fees of Becker & Tenenbaum, the trustee's special litigation counsel, on account of its role in negotiating the $4 million payment to Cummings. Theodore Becker was Cummings's personal lawyer as well as the trustee's special counsel, which the bankruptcy judge thought to be an unpardonable conflict of interest. 59 B.R. at 489–92. And foreshadowing what was to come, the judge chastised the trustee's counsel for submitting a blunderbuss request for fees. *Id.* at 494–95.

All but one of the purported stockholders appealed to the district court. When the trustee moved to dismiss these appeals on the ground that shareholders' interests are represented by the trustee, Nicholas G. Ma-

nos of Epton, Mullen & Druth, representing Joan G. Rafel and George S. Kamberos—the record owners of 49% of Central's stock—filed a brief defending his clients' right to appeal. The appeal was appropriate, this brief said, because the bankruptcy judge had allowed Rafel and Kamberos to intervene as parties, and parties may appeal as of right. The brief also contended that the trustee could not represent the stockholders, because of the conflict of interest and the trustee's apparent preference of the interests of creditors over the equity claimants.

The district court dismissed this and all of the other appeals for want of jurisdiction, concluding that the stockholders were not the proper parties. 62 B.R. 357 (N.D. Ill.1986). The court later denied the trustee's request for sanctions under Fed.R.Civ. P. 11 against stockholders other than Rafel and Kamberos.[1] This claim the court granted in part. The court concluded that the shareholders had a plausible argument, given the trustee's conflict of interest and the fact that the dispute in the bankruptcy court largely was about the size of the surplus that would be available for equity investors. The brief filed by Rafel and Kamberos, however, represented that the bankruptcy court *had* allowed them to intervene. The district court catalogued eight misrepresentations that it viewed as serious and substantial, writing that "[n]o attorney who made a reasonable inquiry into the facts of this case before drafting a response to the motion to dismiss could have been mistaken regarding this central issue." The court also concluded that attorney Manos's request for sanctions under Rule 11—a motion contending that the trustee's request for sanctions was a violation of Rule 11—was itself sanctionably frivolous. The court thought this motion untimely in part, addressed in part to matters that occurred in other courts, and just plain silly. (Mr. Manos contended, for example, that the trustee's papers violated Rule 11 by referring to Rafel and Kambe-

---

1. The court awarded a sanction of $100 against another appellant, but this does not now concern us.

ros as "putative" shareholders rather than "prima facie" shareholders.) The district court specified:

> The Trustee is to submit to this court a statement of attorney's fees and costs incurred in responding to the misrepresentations made by Manos, [Rafel, and Kamberos] in their response to the Trustee's motion to dismiss. The Trustee ... [is] to submit to this court a statement of attorneys' fees and costs incurred in responding to the motion for sanctions presented on behalf of Joan Rafel and George Kamberos by Manos.

The court had called for two statements of fees—one dealing with the cost of responding to a single paper, the other dealing with the cost of responding to a portion of another paper. What the court received was a horse of another color. The trustee submitted a single request for $172,491.82, representing 1,335.55 hours of attorneys' time. Scraping himself off the ceiling, the district judge vacated the award of fees—although he left standing, as a sanction, the conclusion that Manos had violated Rule 11.

The proceedings in the district court so far had been conducted on paper, with no new discovery or hearings. The judge remarked that it "is unbelievable that 1,335 hours could have been spent reasonably or anything even approaching that figure" for the whole proceedings in that court. "Even a tenth of that figure ... would be the outer limits of reasonable time"—and the court had not awarded fees for so much as a tenth of what had occurred before it, which would imply an award of $2,000 or so. The court concluded that the appropriate sanction for filing an outrageous request for fees is a denial of fees altogether.

While the parties were disputing the Rule 11 issues before the district court, the shareholders were prosecuting appeals from that court's order dismissing their appeals. These pending appeals blocked the estate's collection of the settlement funds from McDonald's, so the trustee was anxious to get the cases resolved. Over a period of months, all but two of the shareholders dismissed their appeals. The holdouts were Rafel and Kamberos, still represented by Manos. Six months after filing the notice of appeal, Manos had yet to produce a brief. Confronted with the trustee's motion to dismiss, he asked for more time. We examined the papers (including Manos's response to the motion to dismiss, at the time the only document even to hint at a theory of the appeal) and concluded that the appeal was pointless. Without waiting for the briefs, we affirmed the district court's decision on January 29, 1987. The settlement became final, and the estate collected the proceeds. The trustee, true to form, filed a motion for sanctions under Fed.R.App.P. 38, contending that Rafel and Kamberos had pursued a frivolous appeal to block the approval of the settlement and give themselves bargaining leverage. (The trustee asserts that they offered their shares in Central—prima facie or putative—to McDonald's for $2 million. McDonald's declined this generous offer.) We called for briefs on that motion and consolidated the request under Rule 38 with the trustee's appeal from the denial of monetary sanctions under Rule 11.[2] Manos does not appeal the censure for violating Rule 11, but he contends that no monetary sanction should be imposed.

## II

The district court concluded that the Rafel–Kamberos appeal of the bankruptcy

2. The trustee filed two notices of appeal. No. 86–3111 addresses the district court's partial denial of the motion for sanctions, and No. 87–1022 addresses the district court's vacation of the award of fees on the remainder of the trustee's motion. We dismiss No. 86–3111 because the disposition of the request for fees was not "final" at the time the appeal was filed. Fees had been denied in part and granted in part; the grant had not been quantified. Moreover, Rafel, Kamberos, and Manos moved for reconsideration of the partial grant; this motion under Fed.R.Civ.P. 59—ultimately granted—suspended any finality the disposition may have had. The original order therefore was not appealable, Fed.R.App.P. 4(a)(4); *Sidag Aktiengesellschaft v. Smoked Food Products Co.*, 813 F.2d 81, 84 (5th Cir.1987); *Gates v. Central States Teamsters Pension Fund*, 788 F.2d 1341, 1343 (8th Cir.1986). Appeal No. 87–1022, which addresses the final disposition of the request for fees, brings up all of the issues.

court's decision did not violate Rule 11. The trustee challenges this decision. We apply a deferential standard on review of the question whether the filing of a paper violated Rule 11. *R.K. Harp Investment Corp. v. McQuade,* 825 F.2d 1101, 1103 (7th Cir.1987). Although, as we held in *Brown v. Federation of State Medical Boards,* 830 F.2d 1429, 1434 n. 3 (7th Cir.1987), a court must impose a sanction once a violation has been established, the decision whether there has been a violation is a judgment call. The Rule speaks of "reasonable" pre-filing inquiry, the language of tort law. And although the definition of a frivolous legal position is itself a question of law, there will often be factual questions concerning the actual position the litigant took—questions on which the court of first instance has the leading role. See *Anderson v. Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Mucha v. King,* 792 F.2d 602, 604–05 (7th Cir.1986); *Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d 1423, 1427–29 (7th Cir.1985).

This case illustrates why we employ deferential review. A notice of appeal from a bankruptcy court to a district court is a "paper" covered by Rule 11, but because the notice does not contain a statement of reasons, it is impossible to determine, from its contents, whether counsel did the necessary pre-filing work and had a good argument. The district court accordingly looked to the brief Manos filed in response to the trustee's motion to dismiss. Much of this brief relies on the supposed grant of intervention before the bankruptcy court—a line of argument the district court found to violate Rule 11. But the last ten pages of the brief contend that the conflict of interest of the trustee's special litigation counsel, and the trustee's apparent preference for creditors' over stockholders' interests, make it necessary (and therefore appropriate) for the stockholders to protect their own interests. Although the trustee and the corporation itself presumptively represent all interests in a bankrupt firm, which prevents stockholders from litigating on their own, see *In re Michigan—Ohio Building Corp.,* 117 F.2d 191, 193 (7th Cir.1941), this presumption is not an absolute barrier. See *In re Carbide Cutoff, Inc.,* 703 F.2d 259 (7th Cir.1983) (permitting a special counsel representing unsecured creditors to appeal separately).

The trustee preferred the creditors over the shareholders. The trustee's counsel, James Carmel, testified that in negotiating the settlement he "did not consider the interest of shareholders". This is an unusual posture for a trustee, whose duty is to maximize the value of the estate, not of a particular group of claimants. Central Ice Cream had assets sufficient to pay all creditors. This made the shareholders the residual claimants; each additional dollar would go to them. It is true, as the bankruptcy judge wrote, that spurning the settlement would expose the creditors to risk, but this parallels the risk creditors face outside of the bankruptcy process as firms try to maximize the expected value of the enterprise. The bankruptcy court should try to implement, rather than alter, non-bankruptcy entitlements. See *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law* 7–67 (1986). Both shareholders and creditors have such entitlements.[3]

---

**3.** Any risk to the creditors could have been eliminated by putting the firm up for sale. The sale would have produced a pot of cash from which claims would have been satisfied. See Douglas G. Baird, *The Uneasy Case for Corporate Reorganization,* 15 J. Legal Studies 127 (1986). Investment banks make a living by peddling assets to willing buyers. The potential buyers in a case like this include investment syndicates and even Central's creditors and the putative stockholders. If the $15.5 million settlement was too steep a discount, someone would have been willing to bid more in an auction. The price for which Central could be sold would have reflected the value of the victory in the state suit. The sale could not have made the creditors worse off, because $15.5 million would have been the reservation price in such an auction. If $15.5 million were at or above the expected value to be realized from Central's verdict, no one would buy the firm at a higher price; if the stockholders' experts were right, a buyer could be found. The competitive process would bring more information to bear, and its outcome would be more reliable than that of a hearing in court—for self-interest con-

■ Although shareholders outside of bankruptcy must file a derivative suit if they believe that the firm errs in accepting a compromise of pending litigation, bankruptcy alters the procedure by which investors of all kinds assert their claims. Creditors outside of bankruptcy may not challenge the firm's decisions; in bankruptcy they may do so, because they are (presumed to be) the principally affected persons, the new residual claimants. Shareholders, too, may pursue their contentions. Whether shareholders may do so *as parties* depends on whether the trustee adequately represents their interests. When, as here, the trustee professes not to represent their interests, they have a substantial reason to litigate independently. Whether that would have been sufficient we need not decide; it is enough to say that the claim is not frivolous—which means that the district court did not abuse its discretion in declining to impose sanctions for the act of filing an appeal.

The feature that gives pause is the nature of the Rafel–Kamberos brief in response to the trustee's motion to dismiss. The brief did not cite or distinguish *Carbide Cutoff, Michigan–Ohio,* or the other cases bearing on the propriety of separate litigation. Parties who want to distinguish or alter existing law must acknowledge its force; they may not pretend that the law favors their view and impose on the court or their adversaries the burden of legal research to uncover the basic rule. *Szabo Food Service, Inc. v. Canteen Corp.,* 823 F.2d 1073, 1081–82 (7th Cir.1987); *Hill v. Norfolk & Western Ry.,* 814 F.2d 1192, 1198 (7th Cir.1987); *Thornton v. Wahl,* 787 F.2d 1151, 1154 (7th Cir.1986). In our case, however, the trustee had to make the first move because a notice of appeal does not contain citations. The Rafel–Kamberos

brief in opposition to the trustee's motion referred to the governing cases by citing the portion of the trustee's memorandum relying on them, and it proceeded to offer arguments about why the stockholders nonetheless should be allowed to appeal in this case. The district court was entitled to consider this sufficient—if barely—to satisfy Rule 11.

### III

The district court found that a portion of the Rafel–Kamberos brief violated Rule 11 by representing that the bankruptcy court had allowed the shareholders to intervene. Manos does not contest this conclusion, which is beyond serious challenge. Counsel may not present as a fact what counsel thinks should have occurred. *In re Kelly,* 808 F.2d 549 (7th Cir.1986); *In re Curl,* 803 F.2d 1004 (9th Cir.1986). The misrepresentations occupied about ten pages of the brief in opposition to the trustee's motion to dismiss. The district court also found that Manos's motion for sanctions violated Rule 11; again Manos does not defend his motion.

The trustee submitted a bill for more than $172,000, which the district judge thought preposterous—rightly so. The shareholders' appeals did not occasion discovery or testimony, so the district court found the bill impossible to fathom even as a statement of total expenses for the shareholders' appeals. But of course the court had not allowed the trustee to recover all legal fees incurred in connection with the appeals; it had allowed only fees incurred in responding to one document and a portion of a second. The bill was not a good faith effort to comply with the court's order. The trustee sought compensation for 440 hours spent before Manos even filed a

centrates the mind, and people who must back their beliefs with their purses are more likely to assess the value of the judgment accurately than are people who simply seek to make an argument. Astute investors survive in competition; those who do not understand the value of assets are pushed aside. There is no similar process of natural selection among expert witnesses and bankruptcy judges.

Perhaps it is significant that the shareholders did not offer to buy the firm from the trustee for more than $15.5 million or ask the bankruptcy court to conduct an auction. If neither the shareholders nor an investment syndicate, which any one of them was free to organize, was willing to back the professed belief in the value of the judgment with cash, the bankruptcy judge may have been on firm ground in accepting the settlement.

reply to the motion to dismiss; it did not attempt to separate time devoted to the Rafel–Kamberos appeal from time devoted to the other appeals, although the district court denied the application for fees concerning the other appeals; it did not attempt to separate time devoted to the sanctionable portion of the Rafel–Kamberos filings from time devoted to other portions, which the district court held were not sanctionable. Even in this court, the trustee has not attempted to comply with the district court's order and insists that it is impossible or unnecessary to segregate the time according to its cause.

■ It can therefore be no surprise that the district court did not wade through the trustee's voluminous time records to rescue the compensable time from the sea of non-compensable hours. If the trustee was unwilling or unable to perform this task, the district court certainly was not required to do it. A party seeking attorneys' fees must present a request from which the correct amount may be computed with reasonable dispatch. The failure to do this justifies a rejection of the request. E.g., *Tabcor Sales Clearing, Inc. v. United States*, 723 F.2d 26, 29–30 (7th Cir.1983). The trustee was entitled to present to the district court a full statement of his expenses, in order to perfect the record for an appeal seeking to increase the award. The trustee did not, however, file one statement of fees complying with the district court's order and a second to complete the record; he filed one statement and represented that he is entitled to the whole $172,000 under the district court's order. That position is untenable.

■ Our difficulty is that the district court did not deny the request for failure to segregate compensable time from other time. The court denied the request because it perceived the bill to be astronomical. It relied on *Brown v. Stackler*, 612 F.2d 1057 (7th Cir.1980), which held that a court may deny a bloated request for fees under 42 U.S.C. § 1988. We conclude in *Frantz v. United States Powerlifting Federation*, 836 F.2d 1063, decided today, that

*Brown v. Stackler* does not govern requests under Rule 11. *Brown v. Stackler* rests on the district court's discretion to award no fees under § 1988; Rule 11, which says that the court "shall" impose a sanction, leaves the judge no such discretion.

■ An excessive request for fees is a sanctionable event, and district courts should try to impose sanctions for each independently-sanctionable event. If these turn out to offset, so it goes; if the difficulty of ascertaining sanctions makes a rough equation of the two desirable, the judge may cancel them; but before holding the dual acts of misconduct a wash, the court should consider whether the two objectionable acts deserve roughly equal sanctions. Just as in modern practice the misconduct of a party does not terminate its right to equitable relief, see *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 193–95 (7th Cir.1985); *Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985), so the misconduct of a party does not terminate its right to attorneys' fees established as a result of its opponent's independent wrong.

It is not necessary, however, to remand this case for reconsideration in light of *Frantz*. The trustee has yet to estimate the number of hours devoted to opposing the portions of the Rafel–Kamberos filings that the district court found sanctionable. Counsel informed us at oral argument alternatively that it would be impossible to produce an estimate and that the best estimate would be about $86,000 (half of the total). Either position inevitably would produce a new denial of the request on remand. Moreover, the two sides' misconduct seem to be of roughly equal gravity. The attorneys' fees reasonably necessary to puncture ten pages of transparently incorrect assertions in the motion in opposition, and to respond to a featherweight motion for sanctions, cannot exceed $10,000 and probably are lower—unless the limit to "reasonable" fees be abandoned. Manos's costs in responding to the request for $172,000—costs that include the hiring of Jenner & Block as outside counsel, which must have required a thorough review of

the trustee's voluminous documentation—must have been in the same range. It is inappropriate to subject the parties and the district court to the costs of a remand, when the outcome of that remand is foreordained.

## IV

The trustee requests sanctions under Fed.R.App.P. 38 for the appeal Rafel and Kamberos took to this court. The briefing of the appeal, which was docketed on July 8, 1986, was deferred at Manos's request—and over the trustee's strong objection—while the district court considered the trustee's request for sanctions in that court. The trustee took the position that the request for sanctions did not affect the merits of the appeal, which should be resolved as quickly as possible to permit the settlement to be implemented or abandoned. After the district court announced its decision on November 21, 1986 (and took back the monetary award on December 9) Manos still was reluctant to file an opening brief. On December 17 the trustee moved to dismiss the appeal or, at a minimum, set an accelerated briefing schedule. On December 19 Manos filed a five-page memorandum in opposition, asking us to grant him until March 18, 1987, to file an opening brief. A motions panel of this court read the papers, concluded that the case should be disposed of but despaired of receiving an opening brief, and summarily affirmed the district court's judgment on January 29, 1987.

■ The only paper that tries to justify the prosecution of the appeal is the memorandum of December 19, 1986. Although the trustee's motion repeated the arguments that had persuaded the district court, Rafel and Kamberos did not respond to them. The memorandum did not cite *Carbide Cutoff* or any other relevant case. Instead Manos asserted that it was premature to consider the trustee's arguments. This was hardly a sufficient response. The trustee contended that the estate's best interest lay in prompt consummation of the settlement, which Rafel and Kamberos had no business blocking. That contention deserved, and did not receive, an answer. We had to consider the merits of the appeal without the assistance of counsel for the appellants, who gave every sign of filing an unending series of requests for extensions of time. After we affirmed the judgment, Rafel and Kamberos filed an application for leave to file a petition for rehearing in excess of 15 pages. When we denied this motion, they declined to file a petition for rehearing (though 50 days after our decision they filed a motion for still more time to file—after which we ordered that the mandate issue forthwith). Perhaps Rafel and Kamberos had a good argument with which to challenge the district court's decision; they did not make it. Sanctions under Rule 38 are appropriate. Appellants must be willing to prosecute their appeals, not just to file perpetual motions.

■ The trustee is entitled to *reasonable* attorneys' fees for the time spent preparing motions to dismiss the appeal and objecting to the many motions for extension of time and motions for leave to file overlong papers. The trustee asks for damages as well. According to the trustee, McDonald's was paying interest at 8% on the settlement funds pending final disposition of the appeals. Central's solvent estate had to pay interest at a higher rate to its creditors—among whom was Kamberos. The trustee wants damages measured by the difference between the rates of interest. We deny this request. The interest rate differential came at the expense of the shareholders, the residual claimants to this estate. All of the principal claimants to shares (including Cummings) prosecuted appeals. They deemed the appeals in their interest notwithstanding that they bore the expense, which makes this an inappropriate item of damages; they need not pay the same item twice. And although Kamberos is a creditor of the estate as well as a stockholder, more of his debt is interest-free than is interest-bearing; again he appears to be a net loser from delay. It may be that delay put Rafel and Kamberos in a position from which to negotiate a settlement, but this is not the same thing as injuring the estate.

Appeal No. 86–3111 is dismissed for want of jurisdiction. The judgment under review in No. 87–1022 is affirmed. We award attorneys' fees as damages under Rule 38 in No. 86–2116. The trustee has 14 days to submit an itemized, and fully explained, statement of the attorneys' fees reasonably incurred in defending that appeal.