**In re CENTENNIAL TEXTILES, INC. and Dynasty Prints, Inc., Debtors.**

**Hal M. HIRSCH, as Interim Trustee of Centennial Textiles, Inc. and Dynasty Prints, Inc., Plaintiffs,**

**v.**

**PENNSYLVANIA TEXTILE CORPORATION, INC., d/b/a Penn–Tex, and Joseph J. Hannagan, Jr., Defendants.**

Bankruptcy Nos. 96 B 46472(BRL), 96 B 46473(BRL).
Adversary No. 97–8501A (SMB).

United States Bankruptcy Court, S.D. New York.

Dec. 11, 1998.

**608**

Gainsburg & Hirsch, New York City, Eric H. Lindenman, of counsel, for plaintiff.

Moritt, Hock & Hamroff, LLP, Garden City, New York, David A. Loglisci, of counsel, for defendants.

## POST–TRIAL MEMORANDUM DECISION

STUART M. BERNSTEIN, Bankruptcy Judge.

The trustee commenced this adversary proceeding to recover damages, and for equitable subordination, based upon events that occurred during the debtors' failed chapter 11 cases. His complaint charges, in substance, that the defendants—Pennsylvania Textile Corporation, Inc. d/b/a PENN–TEX ("Penn–Tex"), and its vice president, Joseph J. Hannagan, Jr.—entered into a fraudulent scheme with the debtors' president, Barry Gersten, to repay a portion of Penn–Tex's prepetition claims. I conducted a trial on August 31, 1998.

The principal issue before me is whether Hannagan should be held liable for the estates' losses under a theory of aiding and abetting the debtors' and Gersten's breach of their fiduciary duties—a theory that the plaintiff neither pleaded nor expressly articulated. For the reasons that follow, I conclude that he should not. Accordingly, the trustee is entitled to recover a judgment solely against Penn–Tex in the aggregate sum of $140,462. In addition, Penn–Tex's counterclaim is dismissed.

## BACKGROUND

At all relevant times, the debtors were engaged in the business of converting raw textiles, or greige goods, into finished goods pursuant to their customers' requests. (Transcript of trial, held August 31, 1998 ("Tr.") at 17.) Toward that end, the debtor used third party processors, such as Penn–Tex. Typically, the debtors received orders from customers, and shipped the greige goods, in bulk, to Penn–Tex. Penn–Tex finished the amounts needed and shipped the finished goods directly to the debtors' customers. Penn–Tex retained any unfinished greige goods supplied by the debtors for future orders. (*Compare* Complaint ¶ 17 *with* Amended Answer ¶ 2.) Hannagan was a vice-president of Penn–Tex, (*see* Amended Answer ¶ 6), and was authorized and empowered to conduct business transactions on its behalf. (*Compare* Complaint ¶ 40 *with* Amended Answer ¶ 2.) Barry Gersten, a nonparty who figures in the case, was the president of the debtors.[1]

The debtors filed these chapter 11 cases on November 27, 1996. On that date, they owed Penn–Tex approximately $690,000.00. (*See* Plaintiff's Ex. ("PX") 1, at p. 2.) Although Penn–Tex claimed to be secured, it also contended that it was undercollateralized in the amount of $232,533.11. (*Id.*)[2] After the case was converted to chapter 7 on February 13, 1997, and the plaintiff was appointed trustee, he commenced this action primarily to recover postpetition payments by the debtors to Penn–Tex. His complaint charges that the debtors and Penn–Tex entered into a fraudulent scheme to pay down Penn–Tex's prepetition debt. Specifically, Gersten agreed with Hannagan to pay inflated Penn–Tex invoices covering postpetition processing, enabling Penn–Tex to "catch up" and reduce its prepetition claim.

---

1. The complaint does not allege that Gersten was the president of the debtors, and the only evidence of his status came during the testimony of the trustee's accountant. (*See* Tr. 24.) Nevertheless, the defendants refer to Gersten as the debtors' president in their post-trial brief, *see Defendants' Post–Trial Brief,* dated Oct. 5, 1998, at 3, 13, 14, and hence, concede the point.

2. Penn–Tex did not offer any evidence of a security interest. The fact that Penn–Tex processed the debtors' raw textiles does not necessarily give it a processor's lien. *See Ash Handkerchief Corp. v. Hickory Finishing, Inc. (In re Ash Handkerchief Corp.),* 191 B.R. 588, 591–93 (Bankr.S.D.N.Y. 1996) (discussing the common law of processor's liens).

The complaint asserted five causes of action based on this fact pattern. The plaintiff sought recovery against Penn–Tex on theories of unauthorized postpetition transfers (First Claim), common law fraud (Second Claim), intentional fraudulent transfers under state law (Third Claim), a related state law claim for attorney's fees (Fourth Claim) and equitable subordination (Fifth Claim). The trustee also sought to recover under the second, third and fourth claims against Hannagan, essentially for aiding and abetting the improper transfers to Penn–Tex.

At trial, the trustee proffered testimonial and documentary evidence in support of his claim. The debtors had paid Penn–Tex a total of $347,038 for postpetition processing.[3] (PX 3; *compare* Complaint ¶ 26 *with* Amended Answer ¶ 5.) Andrew Plotzker, a partner at BDO Seidman, LLP, the trustee's accountant, reviewed postpetition invoices representing approximately 16%, in amount, of the postpetition work, and compared the prices the debtors paid to Penn–Tex prepetition and postpetition for the same processing services. He concluded that Penn–Tex overcharged the debtors, on the average, by 68% for the postpetition services. (Tr. 44.) At the prepetition prices, the same processing services would have cost $206,570. (*Id.* 51.) Thus, the total overcharge equaled $140,462; Centennial overpaid $130,262 and Dynasty overpaid $10,200.[4]

While Plotzker's analysis proved the overpayment, it did not illuminate the debtors' reasons for overpaying. Hannagan—who did not testify—supplied the answer in a letter he wrote to Gersten on January 16, 1997, (PX 1), while the debtors were still in chapter 11. Hannagan stated that "Penn–Tex will need 'Centennial' to send in another 250,000 greige goods to be processed at the prices agreed to; for Penn–Tex to break even." The attached schedule, apparently prepared by Penn–Tex employee Gina Roman, depicted the amounts that the debtors owed Penn–Tex, and the value of Penn–Tex's collateral, on the chapter 11 filing date and on January 15, 1997. While the schedule is hardly self-explanatory, it shows that between these two dates, Penn–Tex had reduced its total claim by $235,523.16 and its undersecured position by approximately $30,000.00. The schedule and covering letter, considered in light of Plotzker's testimony, leads to the conclusion that the debtors overpaid for postpetition services to reduce Penn–Tex's prepetition debt.

At the conclusion of the trustee's direct case, Hannagan moved to dismiss the complaint. *See* Fed.R.Civ.P. 52(c),[5] made applicable by Fed.R.Bankr.P. 7052. He correctly contended that the trustee had not offered evidence that Hannagan had ever received any of these overcharge payments. Pursuant to 11 U.S.C. § 550(a), a trustee may recover a fraudulent transfer from the transferee or from one for whose benefit the transfer is made.[6] Conversely, section 550(a) does not permit recovery from one who merely aids and abets a fraudulent transfer, and neither does state law. *Lippe v. Bairnco Corp.*, 225 B.R. 846, 857 (S.D.N.Y.1998); *Federal Deposit Ins. Corp. v. Porco*, 75

---

**3.** Of this sum, $321,836 was paid by Centennial, and $25,202 was paid by Dynasty. (PX 3.)

**4.** Centennial accounted for 92.74% of the debtors' postpetition business with Penn–Tex. (*See* footnote 3, *supra*.) Accordingly, it paid a like per cent of the overcharges which I have rounded off to the nearest whole dollar amount.

**5.** Rule 52(c) states:

If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

**6.** Section 550(a) states:

Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

N.Y.2d 840, 552 N.Y.S.2d 910, 552 N.E.2d 158, 159–60 (N.Y.1990). Consequently, I granted the motion to dismiss the third and fourth claims which sounded in aiding and abetting a fraudulent transfer.

However, I denied the motion to dismiss the second cause of action. It alleged that Hannagan had aided and abetted Penn–Tex's common law fraudulent scheme to overcharge the debtors. (Complaint ¶¶ 39–42, 45.) The second cause of action did not specifically mention breach of fiduciary duty, but the allegations and the proof appeared to support recovery under the unpleaded theory. (*See* Tr. 69–70.) Hannagan's counsel protested that the theory had not been properly raised or tried, and he was not prepared to meet it. (Tr. 70–72, 76.) [7]

I adjourned the trial (it was 4:30 p.m.) until 10:00 a.m. the next morning, at which time Hannagan could testify if he so chose. The following day, his counsel announced that the defense rested without offering any evidence. (*See* Transcript of hearing, held Sept. 1, 1998, at 3.) I reserved decision on this claim as well as the claims asserted against Penn–Tex.

## DISCUSSION

### A. Claims Against Penn–Tex

■■■ The trustee's first cause of action is straightforward and meritorious. It charges that Penn–Tex received an unauthorized postpetition transfer in the aggregate sum of $140,462 from the debtors in violation of 11 U.S.C. § 549.[8] The party asserting the va-

lidity of a postpetition transfer has the burden of proof. Fed .R.Bankr.P. 6001. Penn–Tex did not offer any evidence at trial, and failed to carry its burden.

Further, the trustee established each of the elements of the claim at trial. He demonstrated that Centennial overpaid $130,262, and Dynasty overpaid $10,200, after the commencement of the case. The transfers were made on account of prepetition debts, and were unauthorized. Accordingly, the trustee can avoid the transfers under 11 U.S.C. § 549(a), and recover their value from the initial transferee, Penn–Tex. *See* 11 U.S.C. § 550(a).

■■ Conversely, the trustee's third and fourth causes of action, brought under state fraudulent conveyance law, made applicable through 11 U.S.C. § 544(b) [9], must be dismissed. The only improper transfers proved at trial occurred postpetition. Section 544(b), and hence, state law, applies solely to prepetition transfers. *Moratzka v. Clark (In re Metropolitan Cosmetic Reconstructive Surgery P.A.)*, 125 B.R. 556, 557 (Bankr. D.Minn.1991); *Eisenberg v. Bank of New York (In re Sattler's, Inc.)*, 73 B.R. 780, 790–91 (Bankr.S.D.N.Y.1987).

■■ Next, the trustee's request for equitable subordination has been rendered moot. By virtue of the entry of judgment in connection with the first claim, any Penn–Tex claim is subject to disallowance under 11 U.S.C. § 502(d).[10] Equitable subordination,

---

**7.** Hannagan did not attend the trial. He was available and on call the entire day, (Tr. 72, 76), but his attorney could not reach him when he tried at the conclusion of the trustee's direct case. (Tr. 73.)

**8.** Section 549(a) states, with exceptions that are not relevant:

[T]he trustee may avoid a transfer of property of the estate—
(1) that occurs after the commencement of the case; and
(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
(B) that is not authorized under this title or by the court.

**9.** Section 544(b) states:

The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable

under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

**10.** Section 502(d) states:

Notwithstanding . subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

on the other hand, merely postpones payment but does not disallow the claim. *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr.S.D.N.Y.1994). It is an alternative remedy to monetary recovery from the wrongdoing claimant. *ABF Capital Management v. Kidder Peabody & Co. (In re Granite Partners, L.P.)*, 210 B.R. 508, 517 (Bankr. S.D.N.Y.1997). Consequently, a trustee cannot recover damages and equitably subordinate a claim based upon the same wrong. *Id.*

Penn–Tex cannot receive any distribution until it pays the judgment in this case as well as other judgments that the trustee has recovered against it on account of preferential transfers. If it pays the judgments, the estates will be made whole. In that event, the trustee will not be entitled to the remedy of equitable subordination.

Finally, the trustee purports to assert a common law fraud claim in his second cause of action. For the reasons discussed below, the trustee failed to prove a fraud claim, and it is dismissed.

### B. Claims Against Hannagan

As noted, I dismissed the aiding and abetting claims asserted against Hannagan in the third and fourth causes of action at the conclusion of the trustee's direct case. In addition to the reasons then given, I have now also dismissed the third and fourth claims against the principal wrongdoer. If the trustee cannot recover the transfers from Penn–Tex under his third and fourth causes of action, he cannot prevail against Hannagan for aiding and abetting those transfers. This leaves the second claim.

### 1. Common Law Fraud

■ The second claim does not state a claim for common law fraud, and the trustee did not prove one. Under New York law, the plaintiff asserting fraud must show that the defendant made a false representation of a material fact with intent to deceive, the plaintiff reasonably relied upon the false representation, and suffered damages as a result. *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir.1991); *Katara v.*

*D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987). Proof of a scheme to receive unauthorized postpetition transfers does not necessarily give rise to an action for fraud. *In re Sattler's, Inc.*, 73 B.R. at 789.

Here, the trustee mistakenly equates common law fraud with the more generic and amorphous "scheme to defraud." For example, he points to the January 16th letter as "a clear misrepresentation of the facts with respect to Centennial" because it details what Centennial had to do to reduce Penn–Tex's prepetition debt. (*Trustee's Post–Trial Brief,* dated Sept. 24, 1998, at 6). Whatever else the letter shows about the scheme, it does not contain a misrepresentation of fact, and cannot support a claim of fraud. And without proof that Penn–Tex committed common law fraud, the trustee cannot recover against Hannagan for aiding and abetting a common law fraud.

### 2. Aiding and Abetting a Breach of Fiduciary Duty

■ This leaves the unpleaded theory that Hannagan aided and abetted, or participated in, a breach of fiduciary duty. The claim requires proof that (1) the fiduciary breached his obligations to another, (2) the defendant knowingly participated in the breach, and (3) the plaintiff suffered damages as a result of the breach. *Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 943 (2d Cir.1998); *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir.1986); *Philip Morris Inc. v. Heinrich*, No. 95 Civ. 0328, 1997 WL 781907, at *12 (S.D.N.Y. Dec. 18, 1997); *see Crowthers McCall Pattern, Inc. v. Lewis (In re Crowthers McCall Pattern, Inc.)*, 129 B.R. 992, 999 (S.D.N.Y.1991). The plaintiff is not required to prove that the participant acted with an intention to harm. *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 848 (2d Cir.1987).

Hannagan challenges this claim on due process grounds as well as on the merits. He contends that he lacked notice and a meaningful opportunity to defend the claim. *See Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1172 (1st Cir.1995). Further, he argues that the trustee failed to prove his

claim. Ultimately, I agree with the second point, and hence, do not reach Hannagan's due process claim.

### a. Breach of Fiduciary Duty and Injury

Initially, the trustee established the first and third elements of his cause of action. A debtor in possession owes the same fiduciary duty as a trustee to the creditors and the estate. *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *Wolf v. Weinstein,* 372 U.S. 633, 649, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963). The trustee's fiduciary obligations also fall upon the officers and managing employees who conduct the debtor in possession's affairs. *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. at 355–56, 105 S.Ct. 1986; *Wolf v. Weinstein,* 372 U.S. at 649–50, 83 S.Ct. 969; *Gumport v. China Int'l Trust & Inv. Corp. (In re Intermagnetics America, Inc.),* 926 F.2d 912, 917 (9th Cir.1991); *see generally* 7 Lawrence P. King, *et al., Collier on Bankruptcy* ¶ 1107.02[4], at 1107–13 (15th ed. rev. 1998) ("*Collier*"). Indeed, the willingness to leave the debtor in possession of its assets rests upon the assurance that its managers will carry out these fiduciary responsibilities. *Wolf v. Weinstein,* 372 U.S. at 651, 83 S.Ct. 969; *Slater v. Smith (In re Albion Disposal, Inc.),* 152 B.R. 794, 813 (Bankr.W.D.N.Y. 1993); *In re V. Savino Oil & Heating Co.,* 99 B.R. 518, 526 (Bankr.E.D.N.Y.1989).

As fiduciaries, the debtor in possession and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate, 7 *Collier* ¶ 1107.02[4], at 1107–12; *see In re Central Ice Cream Co.,* 836 F.2d 1068, 1072 (7th Cir.1987), and protect and conserve the debtor's property. *In re Sal Caruso Cheese, Inc.,* 107 B.R. 808, 817 (Bankr.N.D.N.Y.1989). These duties parallel those imposed by section 549: to avoid depletion of the estate. *Shields v. Duggan (In re Dartco, Inc.),* 197 B.R. 860, 865 (Bankr. D.Minn.1996); 5 *Collier* ¶ 549.02, at 549–4 to 549–5. Not surprisingly, therefore, the debtor in possession and the managers breach their fiduciary duties when they violate section 549. *See Stalford v. Blue Mack Transport, Inc. (In re Lands End Leasing, Inc.),* 193 B.R. 426, 434 (Bankr.D.N.J.1996); *Official Unsecured Creditors Comm. v. Kuhns (In re Kuhns* ), 101 B.R. 233, 242 (Bankr.D.Mont. 1989); *In re Sal Caruso Cheese, Inc.,* 107 B.R. at 817; 7 *Collier* ¶ 1107.02[4], at 1107–14.

The debtors, as debtors in possession, and Gersten, their president, owed fiduciary duties to the creditors and the estate. They breached those duties by knowingly paying inflated invoices to permit Penn–Tex to recover a portion of its prepetition debt in violation of 11 U.S.C. § 549. As a result, the estates suffered injuries in the amount of the unauthorized, excess payments.

### b. Hannagan's Knowing Participation

The trustee's proof of Hannagan's *knowing* participation is more problematical, and ultimately falls short. A person knowingly participates in a breach of fiduciary duty if he (1) knows that the primary violator is a fiduciary, (2) knows that the primary violator's conduct is a breach of his fiduciary duty, and (3) affirmatively assists or conceals the breach. *See Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 282–84 (2d Cir.1992); RESTATEMENT (SECOND) OF TORTS §§ 874 cmt.c, 876(b) (1979). Under New York common law, which applies here, the participant must have actual, as opposed to constructive, knowledge, *Kolbeck v. LIT America, Inc.,* 939 F.Supp. 240, 246 (S.D.N.Y.1996), *aff'd,* 152 F.3d 918 (2d Cir.1998) (Table), and the assistance must be "substantial." *Id.* at 247.

Proving actual knowledge is a heavy task, particularly where the aider and abettor does not have a fiduciary or confidential relationship with the injured party. *In re Consol. Welfare Fund ERISA Litig.,* 856 F.Supp. 837, 843 (S.D.N.Y.1994); *Terrydale Liquidating Trust v. Barness,* 611 F.Supp. 1006, 1027 (S.D.N.Y.1984). Liability cannot be imposed absent actual knowledge of the tortious conduct of the primary violator. *Id.* Further, the case may not rest on a bare inference that the defendant must have known the facts; "[t]he plaintiff must support the inference with some reason to conclude that the defendant has thrown in his lot with the primary violators." *Barker v. Henderson,*

*Franklin, Starnes & Holt,* 797 F.2d 490, 497 (7th Cir.1986); *accord Glidden Co. v. Jandernoa,* 5 F.Supp.2d 541, 558 (W.D.Mich.1998). Here, it is not enough to show that Penn–Tex and Gersten or the debtors schemed to pay off Penn–Tex's claim; the trustee must prove that Hannagan actually knew about it.

To do so, the trustee had to prove Hannagan's actual knowledge of the chapter 11 cases at the time that the debtors paid the inflated invoices. If Hannagan did not know that the debtors were in chapter 11, he could not know that they and Gersten were fiduciaries of the creditors and the estates, or that they breached their fiduciary duties by paying Penn–Tex's prepetition claims in violation of bankruptcy law. In this regard, Hannagan's possible knowledge that Gersten was the debtors' president, and hence, a fiduciary *of the debtors,* is not the same. Absent bankruptcy, the payment of Penn–Tex's valid debt would not, without more, breach a fiduciary duty. Further, the trustee concedes that Penn–Tex was "vital" to the debtors' business, (*Trustee's Post–Trial Brief* at 7), and ordinarily, the debtors and Gersten would want do everything in their collective power to satisfy Penn–Tex. Rather, it is the bankruptcy that creates the requisite fiduciary duty *to the creditors and the estate,* and the unauthorized payment under bankruptcy law that breaches it.

The sole evidence of Hannagan's knowledge is the January 16th letter. Admittedly, the letter supports an inference that Hannagan knew about the chapter 11 cases, at least as of January 16th. It compared Penn–Tex's debt position on November 27, 1996, and January 15th. November 27 was the petition date, and there·is no reason to select it for comparison purposes except for its significance as the petition date.

11. For example, the schedule takes the form of a communication from Gina to "Joe." There is no evidence that "Joe" refers to Joseph Hannagan. At best, an inference arises by virtue of its attachment to and transmission with Hannagan's January 16th letter.

12. Section 548(c) states:
      Except to the extent that a transfer or obligation voidable under this section is voidable

Other possibilities, however, also exist. The trustee did not offer evidence regarding Hannagan's role *vis-a-vis* the debtors generally, or in the preparation or transmission of the letter or the accompanying, confusing schedule.[11] It is conceivable that Hannagan's superiors at Penn–Tex directed Hannagan to prepare and send the letter without explaining its significance. Further, the letter speaks to Hannagan's knowledge, if any, as of January 16th. There is no evidence of Hannagan's involvement before then, and most of the invoices that Plotzker reviewed covered services rendered before that date. (*See* PX 2.)

The trustee needed more than the bare inference supplied by the January 16th letter to foist liability on Hannagan. He could have resolved all doubt through the testimony of Gersten or Hannagan, but he called neither. It may be, as Hannagan's counsel suggests, that the trustee was caught totally unprepared to prove a theory he never intended to raise in the first place. Whatever the reason, this record is too flimsy to conclude that Hannagan knew that the debtors' or Gersten's conduct was tortious, or that he threw in his lot with them.

### C. Penn–Tex's Counterclaim

The sole remaining issue is Penn–Tex's counterclaim. It avers that Penn–Tex received the payments in good faith and for value. (Amended Answer ¶ 12.) Citing 11 U.S.C. § 548(c),[12] Penn–Tex alleges that if the transfers are avoided, it is entitled to retain the payments to the extent of the value given. (Amended Answer ¶ 13.) The counterclaim must be dismissed for two reasons. As a threshold matter, the debtors did not assert fraudulent conveyance claims under section 548, and hence, section 548(c) is inapplicable. In any event, Penn–Tex did

under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred, or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

not offer evidence of good faith or value at trial.

## CONCLUSION

The trustee is entitled to recover judgment on behalf of the Centennial estate against Penn–Tex in the sum of $130,262. The trustee is also entitled to recover judgment on behalf of the Dynasty estate against Penn–Tex in the sum of $10,200. The trustee is not entitled to recover judgment against Hannagan, and the claims against him are dismissed. Finally, Penn–Tex's counterclaim is also dismissed. The foregoing shall constitute the Court's findings of fact and conclusions of law.

Settle judgment on notice.