**In re SUNDANCE SELF STORAGE–EL DORADO LP, Debtors.**

No. 10–36676–D–7.

United States Bankruptcy Court, E.D. California.

Nov. 6, 2012.

C. Anthony Hughes, Sacramento, CA, former counsel for Chapter 11 Debtor–in–Possession, appearing in propria persona.

Jason Blumberg, United States Department of Justice, Sacramento, CA, for Acting United States Trustee, Region 17, August B. Landis.

## MEMORANDUM DECISION

ROBERT S. BARDWIL, Bankruptcy Judge.

On July 12, 2012, this court issued an order to show cause directing the debtor's attorney, C. Anthony Hughes ("Counsel"),[1] to show cause, if any he had, why the court should not reconsider the amount approved under an earlier fee award in his favor and why he should not be sanctioned for violating Fed. R. Bankr.P. 9011(b) (the "OSC").[2] Counsel has now filed four declarations addressing the *court's concerns* raised in the OSC and an additional concern that came to light following the issuance of the OSC. The OSC hearing was concluded on October 10, 2012.

For the following reasons, the court will issue an order disallowing all compensation

---

1. Counsel is not to be confused with Gregory J. Hughes and Christopher D. Hughes, of Hughes Law Corporation, counsel for the chapter 7 trustee in this case.

2. Unless otherwise indicated, all Code, chapter, and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532. All rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

previously approved and requiring Counsel to disgorge to the estate of the debtor, Sundance Self Storage–El Dorado LP ("Sundance"), all monies Counsel received as compensation for services and reimbursement of expenses in and in connection with this case and Sundance's earlier case, discussed below.

## I. BACKGROUND

This case presents a graphic illustration of the policies underlying the rules that professionals employed in chapter 11 cases must make full and complete disclosure of their connections with the debtor and other parties-in-interest, must not hold or represent an interest adverse to the estate, and must be "disinterested." This decision is meant to underscore the need for professionals employed by a bankruptcy estate to make full and candid disclosure of all connections, both when applying for approval of their employment and during the pendency of the case. This duty to disclose must be taken seriously—if a professional fails to do so, he or she risks disallowance of all compensation.

Here, Counsel's omissions were so obvious, there can be only two explanations. Either Counsel actively attempted to conceal his disqualifying connections, or, more likely, Counsel's declarations in support of his applications to employ and in response to the OSC were so perfunctory as to render them meaningless. Either scenario is troubling; either scenario warrants disallowance of all fees in this case.

## A. The Transfer of Sundance's Principal Asset

In May 2012, after its two-year attempt to obtain confirmation of a plan of reorganization came to an unsuccessful end, Sundance faced foreclosure on virtually its only asset, a self-storage facility in El Dorado Hills, California (the "Property"), by U.S. Bank (the "Bank"), and a motion by the United States Trustee (the "U.S. Trustee") to dismiss or convert this case.[3] Counsel filed his final fee application and set it for hearing on May 30, 2012, the same day the U.S. Trustee's motion was set for hearing.

On May 24, 2012, after Sundance's attempt to stay the foreclosure in state court had failed, and just six days before the hearings on the U.S. Trustee's motion and Counsel's fee application, Howard Brown ("Brown"), on behalf of Sundance, signed a grant deed transferring the Property to West Coast Real Estate & Mortgage, Inc. ("West Coast"), a corporation wholly owned by Don Smith ("Smith").[4] On May 29, 2012, the day before the hearings, the grant deed was recorded. Six days later, on June 4, 2012, West Coast filed a chapter 11 petition in this court; its bankruptcy counsel is Mohammad Mokarram ("Mokarram"). The same day, the court issued an order granting the U.S. Trustee's motion and converting the Sundance case to a case under chapter 7. On June 6, 2012, the court issued an order approving Counsel's fee application in part, awarding fees of $57,270 and costs of $4,631.

---

3. The court may refer to this case as the "Sundance case" to distinguish it from the West Coast case or the Smith case, discussed below.

4. Brown is the president and sole owner of Peninsula Capital Group, Inc., the general partner of Sundance. Smith was, from the commencement of this case to its conversion to chapter 7, Sundance's "manager of operations." Both had participated heavily in the Sundance case; both were aware that plan confirmation had been denied, that the court had lifted the automatic stay in favor of the Bank, and that the U.S. Trustee was seeking dismissal or conversion of the case.

Smith has admitted he initiated the transfer of the Property from Sundance to West Coast. The transfer was made without the court's approval or knowledge and without notice to the U.S. Trustee or any of the other parties in the Sundance case. The transfer of the Property came to the court's attention in mid-June, when the Bank sought relief from the automatic stay in the West Coast case.

## B. Issuance of the OSC and Counsel's Declarations in Response

The court issued the OSC out of a concern that Counsel may have played a role in the unauthorized transfer of the Property from Sundance to West Coast, a transfer that the court had by then concluded was made in bad faith. As noted in the OSC, the circumstances suggested Counsel may have known of the transfer and the intention of Smith, Brown, or both to put West Coast into chapter 11. In the OSC, the court quoted the Bankruptcy Code's dual requirement that bankruptcy professionals must not hold or represent an interest adverse to the estate and must be disinterested, emphasizing that these requirements continued to apply to Counsel as counsel for the debtor-in-possession up to the date the case was converted to chapter 7. The court also impressed upon Counsel the policies underlying these requirements: ensuring undivided loyalty to the bankruptcy estate and preserving public confidence in the fairness of the bankruptcy system.

Thus, the OSC required Counsel to file a declaration detailing the knowledge and involvement of Counsel, or anyone in his office, of and in the transfer of the Proper-

ty from Sundance to West Coast and the filing of the West Coast case.[5]

### 1. The first declaration

Counsel's first declaration in response to the OSC was equivocal. Counsel stated that at the time of the hearing on the motion to dismiss or convert the case, on May 30, 2012, "[he] did not know that a deed was created to transfer the property and [he] did not know it had been recorded.... [He] was told about the transfer by [Smith] sometime after the hearing...."[6] Counsel acknowledged that he "recommended [Smith] seek legal advice from Mikalah Liviakis, Gerald Glazer, Mo Mokarram, or any other chapter 11 Attorney he could find,"[7] but stated he did not have any meetings or discussions with Smith, Brown, or Mokarram on the subject of the grant deed until after it was recorded. Counsel did not indicate whether he asked Smith why he needed advice from a chapter 11 attorney other than Counsel.

The U.S. Trustee filed a response to Counsel's first declaration, pointing out that Counsel had failed to address whether he was aware, prior to the transfer, that Smith and Brown were contemplating transferring the Property. The U.S. Trustee noted that the 41–day gap from entry of the order lifting the stay to the date of the transfer suggested Counsel may have become aware of their plan to transfer the Property.

### 2. The second declaration

In response to the U.S. Trustee's concerns, Counsel filed a supplemental declaration in which he simply denied any awareness that Smith, Brown, or anyone

---

**5.** *See* Order to Show Case, filed July 12, 2012, Dkt. No. 494.

**6.** Declaration of C. Anthony Hughes in Response to Order to Show Cause, filed July 23,

2012, Dkt. No. 499 ("Counsel's Decl. # 1"), 2:2–5.

**7.** *Id.* at 2:25–28.

else was contemplating the transfer before it occurred. As to the U.S. Trustee's suggestion that Counsel abdicated control of the Sundance case to others, Counsel stated he took a "step back in the case," and in doing so, "saved the estate a huge amount of money...." [8]

Counsel testified that when he accepted the Sundance case, he "did not have all the procedures that [he has] in place now such as having clients sign letters of understanding which outline the responsibilities of the Debtor in Possession." [9] He stated it was, however, his practice at that time to "instill in the Debtor's representatives that a motion is required for any action outside the ordinary course of business. This was instructed early on in the case and [he] had no reason to believe there was any misunderstanding." [10]

Counsel added, however, that at some point, he "recommended [Smith] seek other counsel, but [he] did not recommend other counsel for the purpose of *only* filing a chapter 11 case." [11] This indicates Counsel knew a chapter 11 filing was one of the avenues being contemplated; he must have known such a filing was intended in some way to protect the Property from the Bank's foreclosure. Yet he did not inquire what entity would be doing the filing or what that entity's relationship to the Property would be.

Instead, "[he] recommended Mr. Smith seek advice from other counsel for all purposes because Mr. Smith had numerous types of lawsuits and motions he wanted filed and there was no money to pay administrative expenses and [Counsel's] recommendation was for [a] short sale or chapter 7 conversion." [12] "[T]o an extent, I did know that Mr. Smith was looking into many other approaches and I did not inquire. So to that extent I take responsibility for not taking the time or asking the questions." [13]

In this second declaration, Counsel included one more "additional disclosure." He stated that Smith had told him Brown would cover his attorney's fees. He "may have disclosed" this at the hearing on his fee application. "I definitely disclosed it to the Attorney for [the Bank] because she had the concern that cash collateral would be used and I explained that if any money were to be paid to me it would come from the Debtor's principals." [14] At no time prior to the filing of this declaration had Counsel disclosed to the court that a guarantee by Brown was or might be a part of his fee arrangement for the Sundance case.

### 3. The third declaration

In response to the court's interim ruling

---

8. Supplemental Declaration of C. Anthony Hughes in Response to United States Trustee Response on Order to Show Cause, filed August 8, 2012, Dkt. No. 505 ("Counsel's Decl. # 2"), 2:18, 2:21–22.

> As an Attorney in private practice, I have to balance many forces including the likelihood I will get paid ..., the client's commands and desires, the duty to the court and to my profession. In this instance, the Bank had obtained relief from stay on the only asset of value in the case. There was going to be no estate left to administer. I was keeping my time on the case to a bare minimum.... I didn't imagine any time I

would spend on the case after relief from stay was granted would be of any benefit to the estate.
*Id.* at 4:20–5:4.

9. *Id.* at 3:23–26.

10. *Id.* at 3:26–7:2.

11. *Id.* at 4:7–9 (emphasis added).

12. *Id.* at 4:9–13.

13. *Id.* at 5:5–7.

14. *Id.* at 5:14–18.

on the OSC,[15] Counsel filed a third declaration in which he maintained he "did not have any specific knowledge that certain individuals and entities were contemplating the transfer of the [Property] prior to the conversion of this case to chapter 7." [16] Nevertheless, Counsel now confirmed that he knew a new bankruptcy filing was being considered, and revealed for the first time the possibility that Sundance might have a co-owner in the Property:

> Don Smith did mention a few things.... One was that some other person (I don't recall if the other person was the 2nd mortgage holders or Howard Brown, but it was someone along those lines) owned some percentage of the property which I also recalled from reading the title report earlier in the case.... Don Smith didn't state that he was going to cause a bankruptcy filing based on the title report showing some other partial owner of the property but I did sense that he saw a possibility of the other party who owns the property filing a bankruptcy case. The other owner of the property (if any) would not have needed a transfer of the property to file because they were already allegedly on title.[1718]

What Counsel failed to disclose, in his third declaration or at any other time, was that during virtually the entire two years he represented Sundance as debtor-in-possession in this case, he was also representing Smith in Smith's personal chapter 13 case, Case No. 10–38537–B–13, in another department in this court. Instead, Counsel independently determined that his representation of Smith in Smith's chapter 13 case was not a connection he needed to disclose in the Sundance case.[19]

The court unearthed the fact of Counsel's representation of Smith on its own immediately before the August 29, 2012 continued hearing on the OSC. At the hearing, the court shared its discovery with Counsel, highlighting the severity of his failure to make the appropriate disclosure. The court continued the hearing again, requiring Counsel to disclose the nature and extent of all past and present connections between Counsel and his law office with Smith and his accounting office.[20]

### 4. The fourth declaration

In response to this new concern, Counsel began his fourth declaration by stating

---

**15.** *See* civil minutes for the August 15, 2012 hearing date, Dkt. No. 507.

**16.** Supplemental Declaration of C. Anthony Hughes in Response to Order to Show Cause, filed August 22, 2012, Dkt. No. 509 ("Counsel's Decl. # 3"), 2:6–9.

**17.** *Id.* at 2:9–21.

**18.** This was the first time the possibility that Sundance had a co-owner was ever mentioned in the case, although it is next to impossible to see how creditors and equity security holders could have made an informed decision about the plan of reorganization without knowing the Property might be co-owned by Sundance and some other person or entity.

**19.** Thus, in two declarations in support of his employment in the Sundance case, both filed

*after* he had filed Smith's chapter 13 petition, Counsel stated the following:

> I am not an equity security holder or an insider, and do not have any connection with any insider of the Debtor or any insider of an insider of the Debtor. [¶] I do not hold or represent any interest adverse to the Debtor or It [sic] estate, and I am a "disinterested person" as defined by Bankruptcy Code § 101(14). Also, to the best of my knowledge, ... I have no prior connection with the Debtor, any creditors of the Debtor, or any other party in interest in this case, or their respective attorneys or accountants....

Counsel's Employment Decls., 2:7–13.

**20.** *See* Order, filed August 30, 2012, Dkt. No. 512.

unequivocally, "I have no connection with Don Smith's accounting office. I have no professional arrangements with Don Smith nor [sic] his accounting office." [21] Counsel added, however, that (1) Smith may have filed for an extension on one of Counsel's tax returns, (2) Smith may have filed one of Counsel's business's or corporation's tax returns, and (3) Smith may have prepared a tax return for one of Counsel's employees. In all three cases, Counsel was not sure. As with Counsel's representation of Smith in Smith's chapter 13 case, at no time prior to the filing of his fourth declaration did Counsel disclose any of these possible tax-related connections.

Indeed, Counsel appears to have understood his connections with Smith, both as Smith's attorney and possibly as a tax client of Smith's, to be innocuous circumstances not worthy of disclosure:

I didn't see any connection with Don as being any conflict because Don was not an officer, director of the Debtor and was not the Debtor and was not the decision making person for the Debtor. I'm not saying that I disagree that the court should be concerned; Im [sic] just saying that at the time I didn't think that was a "connection with the Debtor" and therefor had any relevance to the case. From a practical view, I understood the "prior connection" disclosure to be to disqualify a professional to protect against creditors having influence on that professional or to prevent the professional for [sic] having motivation for their self rather than their fiduciary responsibility to the client. I didn't see any of those [as] potential issues or connections.[22]

As will be seen, Smith was the primary representative of the debtor from the beginning—he was the very face of the debtor. It is difficult to see how any knowledgeable bankruptcy attorney could view connections as significant as representing Smith personally and having Smith prepare Counsel's or Counsel's corporation's tax returns as so insignificant that they did not warrant disclosure. It is not up to the bankruptcy professional to weigh the significance of a particular connection; as discussed below, his role is to disclose it fully.

Finally, at no time did Counsel disclose to the court in this case that he had represented Sundance in an earlier case, Case No. 10–34414–D–11 in this court,[23] and was, at the time the present case was filed, still owed money by Sundance for his services in that earlier case. Sundance's earlier case was disclosed in Counsel's interim fee application in this case; Counsel did not, however, disclose that he had been Sundance's attorney in that case or that he was still owed money for his services in that case. In fact, in two declarations in support of his employment in the present case, Counsel stated, "I do not have a prepetition claim against the Debtor or the Bankruptcy estate.... Also, to the best of my knowledge, ... I have no prior connection with the Debtor...." [24]

**21.** Second Supplemental Declaration of C. Anthony Hughes in Response to Order to Show Cause, filed September 12, 2012, Dkt. No. 517 ("Counsel's Decl. # 4"), 2:8–10.

**22.** *Id.* at 3:27–4:9.

**23.** The petition was filed May 31, 2010, and the case was dismissed June 21, 2010 for failure to file required schedules and statements.

**24.** Declarations of C. Anthony Hughes in Support of Application of Debtor and Proposed Debtor in Possession to Employ C. Anthony Hughes as Bankruptcy [Attorney], filed August 3, 2010 and September 26, 2010, Dkt. Nos. 31 and 81 ("Counsel's Employment Decls."), 2:7, 2:10–12.

## C. Don Smith's Role in This Case

The petition in this case was signed by Smith as the debtor's "Manager of Operations." Smith signed all the debtor's schedules, statements, and lists filed in the case, original and amended. According to the debtor's initial status report, Smith had been given authority to act as manager of operations "and [was] working on site as well as assisting in tasks necessary for reorganization."[25] The report also stated that Smith had been hired to "oversee reorganization of the business, increase income, decrease expenses, and play a hands on role in the day to day business activities"; that Smith "project[ed] [a] steady increase in income for the coming months"; and that Smith "plan[ned] on investigating a potential $180,000 debt that may be owed to the business that could be used to help reorganize, and to apply for a reassessment to bring the property taxes down."[26] In short, it was plainly intended, and Counsel understood, that Smith would play a central role in the debtor's reorganization.

Smith's conduct throughout the case was emblematic of managerial control. Smith was the only representative of the debtor to appear at the meeting of creditors. For the first ten months of the case, the bank statements for the debtor-in-possession account were mailed to the address from which Smith operated his tax and accounting practice, as well as several other businesses and investment enterprises, including West Coast. Smith prepared and signed all the debtor's monthly operating reports; signed almost all the declarations filed by the debtor in the case, including the only declarations in support of its motions to use cash collateral, to assume unexpired leases, and to value real property collateral; and signed the debtor's primary declaration opposing the Bank's relief from stay motion.[27]

In that declaration, Smith testified that his duties included "day to day management of the employees, negotiations with suppliers and creditors, and marketing and pricing strategy"; that he assisted counsel with "compiling the statistical and financial information" in the plans and disclosure statements; and that he prepared the plan projections.[28] Smith testified extensively and in great detail about his projections, alleged improvements in the debtor's performance, maintenance and repairs, and prospective new financing.

Smith signed the debtor's plans of reorganization and disclosure statements filed June 10, August 19, and October 14, 2011 (the latter re-filed as modified on November 16, 2011) as "Authorized signer for Howard A. Brown, III, President of Peninsula Capital Group, Inc., General Partner of Debtor."

---

25. Status Report, filed July 9, 2010, Dkt. No. 11, 5:1–2.

26. *Id.* at 2:17–19, 2:21–22, 3:3–5.

27. By contrast, the only declarations signed by any other representative of the debtor were declarations of Brown, president of the debtor's corporate general partner, who signed (1) declarations in support of motions for permission to file his personal financial statements under seal, (2) declarations in opposition to the Bank's objections to Brown's and his sister's claims against the estate, and (3) a single declaration in opposition to a relief from stay motion in which Brown testified only to his own intention to personally guarantee the debtor's plan payments to the Bank. Brown did not sign a declaration in support of plan confirmation and did not appear at the plan confirmation hearing.

28. Declaration of Don Smith in Support of Opposition to Supplemental Brief in Support of Third Motion for Relief from the Automatic Stay, filed September 8, 2011, Dkt. No. 209, 2:14–15, 2:22–24, 3:8.

The debtor's various disclosure statements described Smith's role in the case as follows:

> Don Smith, a professional real estate investor, real estate broker, property manager, and income tax professional [...] has co-managed the on-site operations and staff, overseen monthly budgets, managed communications with the [debtor's] legal counsel, communications with the bank and the limited partnership members.[29]

Aside from an expert witness's declaration regarding commercial lending rates, the only declaration Sundance filed in support of plan confirmation was that of Smith, who testified that, since the commencement of the case, he had been "involved on a daily basis with the marketing, maintenance, income and expense management, and all of the other related duties necessary to effectuate a successful business operation."[30] He also testified about the debtor's financial performance, his opinion of the plan's feasibility, and the debtor's specific intentions for satisfying the secured debt post-confirmation.

In short, Smith was without question the representative of the debtor who played the most active and important role in its reorganization effort. From the outset, he was involved in and essentially in charge of virtually every facet of the chapter 11 administrative process. While Brown may have made certain decisions behind the scenes, Smith made the day-to-day ones and controlled all aspects of the business and bankruptcy processes. In the end, Smith was sufficiently in control of the debtor to arrange for the transfer of the Property to a corporation wholly owned by him. And as will be seen, in light of his personal circumstances, he had a powerful motivation to do so.

## II. ANALYSIS

After accounting for the true nature of the relationships in this case, the court finds that Counsel held and represented interests adverse to the estate and was not a "disinterested person." Therefore, Counsel's employment by Sundance should not have been approved. Further, Counsel failed to disclose his connections with Sundance, with Smith, and with Brown. For both reasons, the court concludes that all compensation and reimbursement of expenses for services provided by Counsel to Sundance before the case was commenced and while Sundance was a debtor-in-possession should be disallowed and all monies received by him for those services and expenses and those he provided and incurred in connection with Sundance's earlier chapter 11 case should be disgorged.

### A. Jurisdiction and Authority

This court has original and exclusive jurisdiction over the employment of counsel, their compensation, and their disclosure obligations, pursuant to 28 U.S.C. § 1334(e)(2), and has the authority to hear and determine this matter pursuant to 28 U.S.C. § 157(b)(1). The matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), as it concerns the administration of the estate.

### B. The Dual Requirement of § 327(a)

■ The Bankruptcy Code imposes significant restrictions on professionals who are employed or compensated by a bankruptcy estate so as to prevent professionals from representing interests adverse to

---

**29.** Sundance Self–Storage–El Dorado LP's Disclosure Statement, filed August 19, 2011, Dkt. No. 196, at 4.

**30.** Declaration of Don Smith in Support of Confirmation of Plan of Reorganization, filed January 17, 2012, Dkt. No. 348, 2:21–23.

the estate. The overarching goals of these restrictions are to ensure undivided loyalty to the estate and to preserve public confidence in the fairness of the bankruptcy system.[31]

"[T]he [debtor-in-possession], with the court's approval, may employ one or more attorneys ... that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor-in-possession] in carrying out the [debtor-in-possession]'s duties under this title." §§ 327(a) and 1107(a); see also DeRonde v. Shirley (In re Shirley), 134 B.R. 940, 943 (9th Cir. BAP 1992) (holding that § 327 "is made equally applicable to a debtor in possession as it is to a trustee by § 1107(a)").

■■■■■ The dual requirement that professionals representing trustees and debtors-in-possession may not hold or represent "an interest adverse to the estate" and must be "disinterested persons" does not evaporate once the attorney's employment is approved.[32] In fact, "the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 ... if, at any time during such professional person's employment ..., such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate...." § 328(c) (emphasis added). Essentially, § 328(c) operates as a "penalty"

for a professional's failure to avoid a disqualifying conflict of interest. See Rome v. Braunstein, 19 F.3d 54, 58 (1st Cir. 1994).

■■■ The term "disinterested person" is defined in the Bankruptcy Code to include one who is not a creditor and "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." § 101(14)(A) and (C). A person who is disinterested "is one that can make unbiased decisions, free from personal interest, in any matter pertaining to the debtor's estate." Shat v. Kistler (In re Shat), BAP No. NV-09-1092-MoDK, 2009 WL 7809004, at *6 (9th Cir. BAP Nov. 25, 2009) (citation omitted) (internal quotation marks omitted). The goal is to achieve undivided loyalty to a cause that is being administered for the benefit of many.[33]

■■■ The phrase to "hold or represent an interest adverse to the estate" has been given meaning by case law.

A generally accepted definition of "adverse interest" is the (1) possession or assertion of an economic interest that would tend to lessen the value of the bankruptcy estate; or (2) possession or assertion of an economic interest that would create either an actual or potential dispute in which the estate is a rival point during their employment. In re Granite Partners L.P., 219 B.R. 22, 35 (Bankr.S.D.N.Y. 1998).

---

31. See generally Anne E. Wells, *Navigating Ethical Minefields on the Bankruptcy Bandwagon*, 31 Cal. Bankr.J. 767 (2011) (surveying ethical duties in bankruptcy cases).

32. "[T]he need for professional self-scrutiny and avoidance of conflicts of interest does not end upon appointment." *Rome v. Braunstein*, 19 F.3d 54, 57–58 (1st Cir.1994). This continuing duty to disclose preserves the integrity of the bankruptcy system by ensuring that professionals working for a trustee or debtor-in-possession do not have conflicts at *any*

33. The dual requirement "serves the important policy of ensuring that all professionals appointed pursuant to section 327(a) tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities." *Rome*, 19 F.3d at 58.

claimant; or (3) possession of a predisposition under circumstances that create a bias against the estate.

*Dye v. Brown (In re AFI Holding, Inc.) (AFI Holding I),* 355 B.R. 139, 148–49 (9th Cir. BAP 2006). *See also In re Martin,* 817 F.2d 175, 180 (1st Cir.1987) (stating that a bankruptcy court must inquire whether the connection created "either a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors—an incentive sufficient to place those parties at more than acceptable risk—or the reasonable perception of one"). "To represent an adverse interest means to serve as an attorney for an entity holding such an adverse interest. For the purposes of disinterestedness, a lawyer has an interest materially adverse to the interest of the estate if the lawyer either holds or represents such an interest." *Tevis v. Wilke, Fleury, Hoffelt, Gould & Birney, LLP (In re Tevis),* 347 B.R. 679, 688 (9th Cir. BAP 2006) (citations omitted).

■ The "adverse interest" language under § 327(a) and the "material adverse interest" prong of the "disinterested person" definition under § 101(14)(C) "telescope into what amounts to a single hallmark." *Martin,* 817 F.2d at 180. This unitary hallmark is designed to filter out conflicts that may jeopardize a fair and equitable administration of the bankruptcy estate.

■ It is equally important in terms of policy that these rules are also meant to preserve the integrity of the bankruptcy system. Therefore, in addition to avoiding conflicts detrimental to a particular case, the rules were drafted to avoid conflicts and questionable relationships that had historically cast the bankruptcy system itself in an unfavorable light. *See, e.g., In re Kendavis Indus. Int'l, Inc.,* 91 B.R. 742, 747 n. 1 (Bankr.N.D.Tex.1988) (citing legislative history of disinterestedness requirement).

■ "There can be a disqualifying conflict even absent proof of actual loss or injury." *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship,* 248 B.R. 668, 695 (D.Mass. 2000).[34] Further, a conflict need not be actual to be disqualifying. "An actual conflict mandates disqualification of a professional to serve in a bankruptcy case. A potential conflict also provides sufficient grounds for a court to deny a professional's employment." *Shat,* 2009 WL 7809004, at *6 (citation omitted); *see also In re B.E.S. Concrete Prods., Inc.,* 93 B.R. 228, 236 (Bankr.E.D.Cal.1988) ("Appearances count. Even conflicts more theoretical than real will be scrutinized.").[35]

In addressing the standards for removing a trustee due to a conflict of interest,

---

**34.** *See also In re Maui 14K, Ltd.,* 133 B.R. 657, 660 (Bankr.D.Hawai'i 1991) (citation omitted) ("Denial of all compensation is justified regardless of actual harm to the estate.").

**35.** The distinction between an actual conflict and a potential one is often difficult to draw; one court would eliminate it altogether.

> [W]henever counsel for a debtor corporation has any agreement, express or implied, with management or a director of the debtor, or with a shareholder, or with any control party, to protect the interest of that party, counsel holds a conflict. That conflict is not potential, it is actual, and it arises the date that representation commences. This holding would apply equally to partnerships. An attorney who claims to represent a partnership, but also has some agreement, whether express or implied, with the general or limited partners, or with any control person, to protect its interest, that attorney has an actual conflict of interest, and is subject to disqualification and a disallowance of fees. The concept of *potential* conflicts is a contradiction in terms. Once there is a conflict, it is *actual—not potential.*

> *Kendavis Indus.,* 91 B.R. at 754.

under § 324(a), the Ninth Circuit has recognized that "a potential for a materially adverse effect on the estate and an appearance of impropriety" may be sufficient, and that the § 101(14)(C) definition of a disinterested person "is broad enough to include a [person] with some interest or relationship that would even faintly color the independence and impartial attitude required by the Code." *See Dye v. Brown (In re AFI Holding) (AFI Holding II)*, 530 F.3d 832, 838 (9th Cir.2008) (citing *AFI Holding I*, 355 B.R. at 149) (internal quotations omitted).

### C. Application of the Employment Standards to Counsel's Employment

The employment of Counsel in this case is a textbook example of a professional who was actually disqualified from employment at the outset on two grounds: he was not a disinterested person (for two independent reasons), and he both held and represented interests adverse to the estate. The court takes each of these disqualifying factors in turn.

### 1. Counsel was not a disinterested person.

### a. Counsel was himself a creditor.

■■■ Counsel was not a disinterested person within the meaning of the Bankruptcy Code, for two reasons. First, Counsel had represented Sundance in an earlier chapter 11 case; when the present case was commenced, Sundance owed Counsel $3,000 for his services in and in connection with the earlier case.[36]

■■■ Although there well may have been ways for Counsel to avoid his creditor status,[37] Counsel did not avail himself of any of those options; thus, he was clearly a creditor when he filed the Sundance case.[38] As a result, Counsel was, by definition, not a disinterested person. § 101(14)(A).[39] And when he applied for and received approval of those pre-petition fees, as part of his application for compensation in the instant case, he improperly elevated a general unsecured claim to a priority administrative expense.

### b. Counsel had an interest materially adverse to the estate's interest by reason of his connection with Smith.

■■■ Second, Counsel was not a disinterested person because by virtue of his simultaneous representation of Smith in Smith's personal chapter 13 case and his representation of the debtor-in-possession in the Sundance case, Counsel had a direct relationship to and connection with the debtor. As explained below, this relationship resulted in Counsel having "an inter-

---

**36.** The time sheets filed with Counsel's interim application for compensation in the present case reveal that 10 hours of services (billed at $300 per hour) for which Counsel sought compensation in *this* case were in fact performed in the *earlier* case.

**37.** Counsel could have withdrawn $3,000 from his retainer before the new case was commenced, applied it to his pre-petition services in the earlier case, and disclosed those circumstances to the court. *See, e.g., Kun v. Mansdorf (In re Woodcraft Studios, Inc.),* 464 B.R. 1, 14 (N.D.Cal.2011) ("[A]ttorneys properly receive pre-filing compensation that they draw down prior to filing—so as to avoid the

potential of being a pre-petition creditor of the estate—and which are fully disclosed so as to comply with disclosure laws."). Or Counsel could have agreed to waive his $3,000 pre-petition claim against the estate, and disclosed the same to the court.

**38.** One who "has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor" is a creditor. § 101(10)(A). A "claim" is simply a "right to payment." § 101(5)(A).

**39.** "It is black-letter law that a 'creditor' is not 'disinterested.'" *In re Kobra Props.,* 406 B.R. 396, 403 (Bankr.E.D.Cal.2009).

est materially adverse to the interest of the estate." [40] § 101(14)(C).

 "Whether an interest is 'materially adverse' necessarily requires an objective and fact-driven inquiry," which, in turn, requires an analysis of the totality of the circumstances. *AFI Holding I*, 355 B.R. at 151 (adopted by the Ninth Circuit in *AFI Holding II*, 530 F.3d at 838). Smith's position as Sundance's "Manager of Operations" and the level of control he exercised in everything from financial reporting and projections, marketing and pricing strategies, management of employees, negotiations with creditors and suppliers, and providing support for virtually all the debtor's motions, as well as its plan, leave no doubt that Smith was a "person in control of the debtor." [41] Thus, Smith fell within the Code's definition of an "insider." *See* § 101(31)(C)(v).[42]

Counsel's representation of Smith in his chapter 13 case cannot be dismissed as a short-term or insubstantial one. Counsel filed Smith's petition less than one month after he had filed Sundance's petition and before Counsel filed his first application for approval of his employment in the Sun-

dance case. The feasibility of Smith's chapter 13 plan depended in part on his income from Sundance. It appears the sole reason for Smith's chapter 13 case was to enable him to keep his home.[43] He succeeded, through Counsel, in valuing a second deed of trust against the home at $0 and filed, through Counsel, an objection to the first trust deed holder's claim, which the court converted to an adversary proceeding. Smith alleged his lender had failed to honor a loan modification agreement and was wrongfully foreclosing on the home.

In Smith's personal case, Counsel filed seven different motions to confirm a chapter 13 plan—one every two to four months. The first six motions were denied. The seventh was filed in February 2012, immediately after Smith's mortgage lender agreed to a new loan modification agreement. The motion was granted and a chapter 13 plan was finally confirmed on April 11, 2012, coincidentally, the day before this court issued its ruling denying confirmation of Sundance's plan of reorganization and announcing its decision to grant relief from stay to the Bank.

**40.** A "disinterested person" does not have "an interest materially adverse to the interest of the estate ... by reason of any direct or indirect relationship to, connection with, or interest in, the debtor...." § 101(14)(C).

**41.** Counsel's time sheets demonstrate that Smith was virtually Counsel's sole contact person for Sundance. Counsel's communications with Brown were far fewer and generally included Brown's own attorneys; in other words, it appears that in Counsel's communications with Brown, Brown was usually acting on his own behalf, not as a representative of Sundance.

**42.** The Code's list of examples is not exclusive.
[I]nsider status may be based on a professional or business relationship with the debtor, in addition to the Code's per se classifications, where such relationship

compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties.
*AFI Holding I*, 355 B.R. at 152–53 (quoting *Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman)*, 126 B.R. 63, 70 (9th Cir. BAP 1991)).

**43.** Smith had no tax or other priority debt, and his plan proposed a 0% dividend on general unsecured claims. Smith, however, had received a chapter 7 discharge in a case commenced two years earlier; thus, he was not eligible for a discharge in the chapter 13 case and in fact waived any discharge in that case. Thus, the plan had no effect on Smith's general unsecured debt.

Thus, Counsel was not just attorney of record but was actively representing Smith—during virtually the entire two-year period of Sundance's chapter 11 case—in Smith's two-year battle to keep his home. Almost as soon as Smith won that battle, one of his primary sources of income, Sundance, was losing its battle, a situation that would again put Smith in danger of losing his home. Thus, Smith had a powerful motive to protect Sundance's property from foreclosure.

In short, during almost the entire pendency of the Sundance case, Counsel owed his loyalty to two clients. What transpired was that the interests of one client, Smith, in keeping his income stream, and thus, his home, ran head-on into the fiduciary duty of the other client, Sundance, to its creditors. The result was that Smith caused Sundance to divest its bankruptcy estate of virtually its only asset at a time when Counsel was representing both, and Counsel failed to investigate the scheme despite the fact that Smith sought advice from him on the "many other approaches" to the problem Smith was considering (Counsel's words).

That the conflict of interest inherent in Counsel's concurrent representation of Smith and Sundance was only a possibility at the beginning of this case does not change the analysis. To be sure, when the conflict materialized, it became a classic illustration of the reasons bankruptcy courts should nip a potential conflict in the bud rather than await its destructive effects.

### 2. Counsel held and represented interests adverse to the estate.

The notion that a professional is not disinterested if he or she has "an interest materially adverse to the interest of the estate" and the requirement of § 327(a) that a professional "not hold or represent an interest adverse to the estate" distill into "a single hallmark." *Martin,* 817 F.2d at 180.

As a creditor of the Sundance estate, Counsel held an interest materially adverse to the interest of the estate. And when Counsel caused his pre-petition claim to be paid as an administrative expense, he elevated his own interest above that of the estate.

In addition, in representing Smith's personal interest as a chapter 13 debtor, Counsel represented an interest adverse to the Sundance estate. Though it may not have been known at the outset that this dual representation would develop into anything nefarious, the potential was there all along, and in the end, came to fruition. When plan confirmation was denied and the stay was lifted, with the prospect that Smith could lose a portion of his income, and thus, his home, he scrambled to do whatever was necessary to prevent the Bank from foreclosing on the Property. Finally, he orchestrated the transfer of the Property to West Coast, thereby divesting the estate of its only significant asset and frustrating the effect of the court's orders granting relief from stay and converting the case to chapter 7.[44]

---

**44.** It cannot be disputed that in doing so, Smith breached his fiduciary duty to the estate. The fiduciary duties of a trustee or a debtor-in-possession "also fall upon the officers and managing employees who conduct the debtor in possession's affairs." *In re Centennial Textiles,* 227 B.R. 606, 612 (Bankr. S.D.N.Y.1998). "Indeed, the willingness of courts to leave debtors in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) (citation omitted) (internal quotation marks omitted).

It must have been clear to Counsel at the time that Smith had in mind various courses of action outside the ordinary course of Sundance's business, all designed to protect the Property from foreclosure. Yet Counsel failed to make clear to Smith what Smith could and could not do without prior court approval and outside the context of Sundance's pending case. Counsel failed to explore with Smith the various avenues Smith was contemplating, and failed to caution him against taking any action involving the Property that would conflict with Smith's duties as a fiduciary to the Sundance estate and its creditors.

 As far as the court can tell, Counsel did not play a direct role in the transfer. But when Smith consulted him, Counsel was duty-bound, as Sundance's attorney, to inquire into the details of the many avenues Smith was considering and their possible consequences to the estate and creditors, and to remind Smith of his duty to maintain as his paramount concern the interests of the Sundance estate and its creditors.[45] Instead, Counsel simply sent Smith on his way with referrals to several other attorneys, and in so doing, failed to avert the chicanery to which Smith ultimately resorted.

 In summary, Counsel's employment fell short of compliance with either of the requirements of § 327(a). From the moment the petition was filed, Counsel was not a "disinterested person" because he was a creditor of the estate. From the moment he began simultaneously representing Smith and Sundance, Counsel was not a "disinterested person" for the additional reason that he had an interest materially adverse to the interest of the estate by virtue of his connections to Smith. Similarly, for both these reasons, Counsel held and represented interests adverse to the estate. Thus, Counsel was disqualified from employment as attorney for the debtor-in-possession; accordingly, the court will exercise its authority to deny allowance of any compensation to Counsel pursuant to § 328(c).

### D. Disclosure Requirements—Fed. R. Bankr.P. 2014(a)

Rule 2014(a) establishes the procedure for the employment of professionals by a trustee or debtor-in-possession. It requires the professional to file an applica-

---

As fiduciaries, the debtor in possession and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate, and *protect and conserve the debtor's property*. These duties parallel those imposed by section 549 [unauthorized post-petition transfers]: *to avoid depletion of the estate*. Not surprisingly, therefore, the debtor in possession and the managers breach their fiduciary duties when they violate section 549.

*Centennial Textiles*, 227 B.R. at 612 (citations omitted) (emphasis added).

**45.** "A debtor in possession's attorney must be proactive, i.e., *prepared to render unsolicited legal advice regarding preventative or corrective action* that may be necessary for the debtor in possession to properly discharge its fiduciary obligations." *In re Count Liberty, LLC*, 370

B.R. 259, 281 (Bankr.C.D.Cal.2007) (emphasis added).

Because the attorney for [a] debtor in possession is a fiduciary of the estate and an officer of the Court, the duty to advise the client goes beyond responding [to] the client's requests for advice. It requires an active concern for the interests of the estate, and its beneficiaries, the unsecured creditors. Consequently, *the attorney may not simply close his or her eyes* to matters having a legal and practical consequence for the estate—especially where the consequences may have an adverse effect. The attorney has the duty to remind the debtor in possession, and its principals, of its duties under the Code, and to assist the debtor in fulfilling those duties.

*In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 840 (Bankr.C.D.Cal.1991) (emphasis added).

tion disclosing, "to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." Rule 2014(a).

 "This rule assists the court in ensuring that the attorney has no conflicts of interest and is disinterested, as required by 11 U.S.C. § 327(a)." *Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park–Helena Corp.)*, 63 F.3d 877, 881 (9th Cir. 1995). The disclosure requirements of Rule 2014 are applied strictly, *id.*, such that "the [professional] has the duty to disclose all relevant information to the court, and may not exercise any discretion to withhold information." *Woodcraft Studios, Inc.*, 464 B.R. at 8 (collecting cases).

It is the bankruptcy court that determines whether a professional's connections render him or her unemployable under § 327(a)—not the other way around.[46]

> The duty of professionals is to disclose all connections with the debtor, debtor-in-possession, insiders, creditors, and parties in interest. . . . They cannot pick and choose which connections are irrelevant or trivial. . . . No matter how old the connection, no matter how trivial it appears, the professional seeking employment must disclose it.

**46.** For a striking example of the consequences of not disclosing connections in a bankruptcy case, *see* MILTON C. REGAN JR., EAT WHAT YOU KILL (The University of Michigan Press 2004); *United States v. Gellene*, 182 F.3d 578 (7th Cir.1999).

**47.** "I do not have a pre-petition claim against the Debtor or the Bankruptcy estate. . . . Also, to the best of my knowledge, ... I have no prior connection with the Debtor. . . ." Counsel's Employment Decls. at 2:7, 2:10–12.

*Park–Helena Corp.*, 63 F.3d at 882 (quoting another source).

 "The duty to disclose is a continuing obligation as to which the risk of defective disclosure always lies with the discloser. Disclosure that later turns out to be incomplete can be remedied by denial of fees." *In re Kobra Props.*, 406 B.R. at 402 (citations omitted). "Even a negligent or inadvertent failure to disclose fully relevant information may result in a denial of all requested fees." *Park–Helena Corp.*, 63 F.3d at 882. Thus, if the bankruptcy court discovers that a professional holds an undisclosed adverse interest, the court has the power to deny all compensation and reimbursement of expenses. Section 328(c); *Woodcraft*, 464 B.R. at 8; *Kobra Props.*, 406 B.R. at 402 ("[T]his Sword of Damocles should be omnipresent in the mind of counsel.").

## E. Application of the Disclosure Standards to Counsel's Employment

### 1. Counsel's status as a creditor and his prior connection with the debtor

Counsel failed to disclose that he had represented Sundance in an earlier case and that he was a creditor of Sundance; in fact, as to both, he testified twice to the contrary.[47] As seen above, under black-letter law, Counsel's status as a creditor would have rendered him ineligible to serve as counsel for the debtor-in-possession.[48]

**48.** In *Woodcraft,* the bankruptcy court denied all compensation to an attorney who failed to disclose he had performed work for the debtor in preparation for the filing for which he had not drawn down on his retainer; in other words, for failing to disclose that he was a pre-petition creditor. *See* 464 B.R. at 5–6. The decision was affirmed by the district court. *Id.* at 10.

### 2. Counsel's compensation arrangements

█ Counsel was required to file with the court "a statement of the compensation paid or agreed to be paid" to him and "the source of such compensation." § 329(a). More explicitly, he was required to include in his fee applications "a statement as to what payments [had] theretofore been made *or promised* to [him] for services rendered or to be rendered in any capacity whatsoever in connection with the case, [and] the source of the compensation so paid *or promised....*" Rule 2016(a) (emphasis added).

In his Rule 2016(b) statement, filed with the petition in the Sundance case, when asked to identify the source of the compensation to be paid to him, Counsel checked the box "Debtor"; he did not check the box "Other (specify)." His signature on that document was a certification that "the foregoing is a complete statement of any agreement or arrangement for payment to [him] for representation of the debtor(s) in this bankruptcy proceeding." [49]

That statement was untrue. On August 8, 2012, in his second declaration in response to the OSC, Counsel disclosed for the first time that Smith had told him Brown would cover his attorney's fees. Counsel recalled telling the Bank's counsel, in response to her concern that cash collateral would be used, that "if any money were to be paid to [him] it would come

from the Debtor's principals." [50] Thus, apparently, Counsel was relying solely on Brown, and not on the debtor, for any compensation over and above the amount of his retainer. This is a disclosure Counsel was required to make in his Rule 2016(b) statement and in his fee applications, pursuant to Rule 2016(a), but did not. [51]

The rule makes no distinction for a "verbal" promise, as Counsel characterizes it. Nor is it relevant that Counsel made the disclosure to the Bank's counsel: the rule requires disclosure to the court. [52] Further, Counsel would be hard-pressed to now argue Brown's promise was not a firm promise: it is clear Counsel intended the Bank's counsel to rely on it to conclude that additional payments to Counsel would not be made from the Bank's cash collateral. Finally, Counsel's current conclusion that "the verbal promise to pay had no effect on [his] loyalty to the debtor" [53] is dismissed: it is self-serving, after the fact, irrelevant, and again, simply not Counsel's conclusion to draw.

### 3. Counsel's connections to Smith

█ The impetus for the OSC was the court's concern that Counsel may have played a role in the transfer of the Property from Sundance to West Coast. The court had no inkling at the time it issued the OSC that Counsel had concurrently

---

**49.** Disclosure of Compensation of Attorney for Debtor(s), filed June 25, 2010, p. 29 of Dkt. No. 1.

**50.** Counsel's Decl. # 2, 5:14–18.

**51.** In *Park–Helena Corp.*, the debtor's counsel stated in its Rule 2016 statement that its retainer had been "paid by the debtor," when in fact, it had been paid by the debtor's president from his personal checking account. The court rejected counsel's argument that the check represented funds the president

owed to the debtor, and thus, that the retainer was actually paid with funds of the debtor. 63 F.3d at 881. Thus, the court affirmed the bankruptcy court's denial of all fees. *Id.* at 882.

**52.** *See Shat*, 2009 WL 7809004, at *9 (holding disclosure to U.S. Trustee's office, rather than to court, not sufficient for purposes of Rule 2014(a)).

**53.** Counsel's Decl. # 2, 5:20–21.

represented Smith during almost the entire pendency of the Sundance case or that Counsel may have utilized Smith's tax preparation services.

As indicated above, in the OSC, the court quoted the sections from the Code establishing the requirements that bankruptcy professionals must not hold or represent an interest adverse to the estate and must be disinterested; the court also set forth the policies underlying these requirements.

Counsel's first declaration in response to the OSC was, as discussed above, ambiguous. He stated only that at the time of the hearing on the U.S. Trustee's motion to dismiss or convert the case, he did not know a grant deed had been prepared or recorded; he had no role in preparing or recording it; he had no role in arranging or assisting with West Coast's chapter 11 filing; and he had no meetings or discussions with Smith, Brown, or Mokarram regarding the grant deed before it was recorded or regarding the West Coast case before the petition was filed.

Counsel closed his first declaration as follows: "I do not and have not represented an interest adverse to the estate. . . . I was always a 'disinterested person' in my representation of the estate." [54]

In response to the U.S. Trustee's concerns, the second declaration revealed that Counsel knew Smith was contemplating a chapter 11 filing by someone or some entity, among other courses of action. After further poking and prodding by the court, Counsel disclosed in the third declaration that he understood Sundance had a co-owner in the Property and that the co-owner might be contemplating a bankruptcy filing, but he made no further inquiry. [55]

Despite the court's concerns, at no point did Counsel disclose—in any of his first three declarations in response to the OSC—that he had been and was still representing Smith in Smith's own chapter 13 case, a case in which the feasibility of Smith's very recently confirmed plan had become shaky because of what had happened in the Sundance case. Nor did Counsel disclose, until his fourth declaration, that he, one of his corporations, and one of his employees may have been tax clients of Smith's. [56]

Counsel had numerous opportunities to supplement his grossly inadequate initial disclosures, knowing the court had serious concerns about the transfer of the Property and the nature of Counsel's connections. Remarkably, Counsel filed three separate declarations, each in response to the court's insistence on further information, each time revealing more about his dealings with Smith regarding Sundance, yet not once did Counsel disclose that he had been and was still representing Smith personally. Instead, it was the court's own fortuitous discovery, immediately before the second hearing on the OSC and after the first three declarations had been filed, that revealed what was clearly a connec-

54. Counsel's Decl. # 1, 5:1, 5:4.

55. "Since I had not been paid anything post-petition in the case, I did not think that Don Smith would pay another Attorney to explore any other options because I didn't think there was [sic] available funds. I thought that the case would end in either a trustee litigating with U.S. Bank or the property being foreclosed or a short sale." Counsel's Decl. # 3, 4:7–12.

56. It is particularly troubling that, although the court had made clear to Counsel that his undisclosed connections with Smith were of grave concern, Counsel still did not bother to determine with certainty whether Smith had provided the tax services mentioned in Counsel's fourth declaration. This underscores Counsel's cavalier attitude and mindless approach toward the disclosure requirements.

tion disqualifying Counsel from employment in this case.

After the court brought to Counsel's attention that it had discovered the connection, in a last-ditch effort to justify his omission, Counsel stated he "understood Don Smith to be an independent contractor consultant charged with the duty to oversee management of Sundance through reorganization." [57] Counsel did not see this as a "connection with the Debtor" that "had any relevance to the case." [58]

■ Aside from whether this statement was genuine, in making this determination, Counsel appointed himself the arbiter of his status as a disinterested person and as the holder or representative of an interest adverse to the estate in the Sundance case. Thus, he defied the fundamental rule that the attorney does not get to pick and choose what connections to disclose based on his or her own perceptions of their relevance. [59]

The court has previously found it necessary to admonish Counsel in other cases of the need for full, candid, and accurate disclosures in regard to employment and bankruptcy cases generally. Despite these cautions and the repeated opportunities he had to bring these critical connections to light, Counsel failed to do so. Counsel's failure to disclose these connections at the outset may well have played a part in the debacle that followed—namely, the transfer of the Property. Further, the transfer of the Property after relief from stay was granted, and Counsel's woeful

failure to disclose his connections in the case, are the sorts of things that negatively affect the public's confidence in the judicial system and the bar. [60]

■ Bankruptcy is a realm in which "the paramount requirement [is] that the court act so as to assure public confidence in the integrity of the judicial process." *Kobra Props.,* 406 B.R. at 405. Here, Counsel took it upon himself to determine which connections and compensation arrangements to disclose and which not to disclose; in doing so, he interfered with the court's exercise of its duty. If he had made the appropriate and required disclosures at the beginning, his employment would have been denied, and this regrettable and unnecessary episode would never have transpired.

### III. CONCLUSION

Counsel's connections with the debtor and its representatives so obviously should have been disclosed that Counsel's failure to disclose them reduced the preparation and signing of his declarations supporting his employment to a perfunctory exercise as to which he either gave no thought at all or made grossly incorrect choices. Moreover, Counsel's failure to make the necessary disclosures as various developments in the case arose, including after the court had plainly expressed the seriousness of the situation, exacerbated the problem.

---

**57.** Counsel's Decl. # 4, 3:24–26.

**58.** *Id.* at 4:3–5.

**59.** "This decision should not be left to counsel, whose judgment may be clouded by the benefits of the potential employment." *In re Lee,* 94 B.R. 172, 176 (Bankr.C.D.Cal.1988).

**60.** "The paramount concern must be to preserve public trust in the scrupulous adminis-

tration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." *People ex rel. Dep't of Corporations v. SpeeDee Oil Change Systems, Inc.,* 20 Cal.4th 1135, 1145, 86 Cal.Rptr.2d 816, 980 P.2d 371 (1999).

For the reasons stated, the court concludes that at all times during his representation of the debtor in possession in this case, Counsel was not a disinterested person and held an interest adverse to the interest of the estate. The court also concludes that from, at the latest, the date Smith's chapter 13 petition was filed, Counsel represented an interest materially adverse to the estate. Finally, the court concludes that Counsel, from the time he filed his first employment application until he filed his fourth declaration in response to the OSC, exhibited a casual—if not willful—disregard of his disclosure obligations under the Code and the Rules. For all these reasons, all compensation for services and reimbursement of expenses will be denied, and all funds Counsel has received in or in connection with this case or with Sundance's prior chapter 11 case must be disgorged, within 10 days from the date of the order issued herewith, to the Sundance chapter 7 trustee for the benefit of the estate.

The court will issue an appropriate order.